MARGARET VALENTINE

*v.*

THOMAS VALENTINE et al.

[Filed March 29th, 1901.]

Decedent was a marine engineer, and invested all of his earnings in property in New Jersey, where he stayed most of the time when on shore, and where his wife resided, but he also had a room and spent a part of his time in New Orleans. In 1893 he and his wife separated, and decedent informed his relatives that he was going to New Orleans until he could make enough to pay the separation expenses. He was never taxed in New Orleans, and refused to vote there because he did not wish to become a resident, and described himself in deeds and in his will as of New Jersey, but informed the colored woman who kept house for him in New Orleans that he would buy a lot and build if she would stay with him, but failed to find a lot to suit him, and in 1897 returned north.—*Held,* that the evidence was not sufficient to show that decedent ever acquired a domicile in New Orleans.

The complainant is the widow of William M. Valentine, who died November 2d, 1897, while on board the steamship "S. Oteri," near Bocos Del Terro, in Central America. He died the owner of about five thousand dollars of personal property, leaving a will, in which he gave all his property to his brothers and sisters, and named his sister Margaret his executrix. She offered the will for probate, and it was proven in the county of Camden, in this state. She has stated her account, showing a balance of $4,483.85, and it has been passed.

The bill sets up that Margaret Wise, the executrix, intends to distribute this balance among the five legatees without allowing complainant anything. It charges that William M. Valentine, the deceased husband, was, at the time of his death, domiciled in New Orleans, Louisiana; that, by the law of that state, she is entitled to one-half of the personal property of which her husband died possessed.

The answer denies that the testator was domiciled in Louisiana at the time of his death, but asserts that his domicile was in the city of Camden.

The answer further asserts that complainant and the testator executed articles of separation on July 24th, 1893, in accordance with which the testator conveyed to the complainant certain real estate in Camden, and complainant joined with the testator in the conveyance of other property of the testator. The answer claims that the terms of the articles of separation, coupled with the conveyance of property to the complainant, operated to release all the property of testator from any claims of the complainant during his life or after his death.

*Mr. Henry I. Budd,* for the complainant.

*Mr. Norman Grey* and *Mr. Lewis Starr,* for the defendants.

REED, V. C.

The bill in this case is modeled after that in *Harrall* v. *Wallis, 10 Stew. Eq. 458; S. C., 12 Stew. Eq. 279.* By it the complainant asserts her right to the one-half of the personal property left by the testator, under the Community law of the State of Louisiana, upon the assumption that the domicile of the testator, at the time of his death, was in that state.

The testator was a marine engineer. The vessels upon which he was employed plied between American ports in North and South America. In 1870 his boat, the steamship "Pioneer," was plying between Wilmington, North Carolina, and Philadelphia. In that year he made the acquaintance of the complainant in Wilmington, at a party, and, as she swears, he married her in that city on March 16th of the same year. Soon thereafter he took her to Philadelphia, where she lived at different places—he paying her board or room rent and staying with her when on shore. Then she went to her sister's in Savannah, Georgia, where he visited her, his boat then running between Philadelphia and Savannah. After about a year she returned to Philadelphia for a time. Then she went to New Orleans, as testator's boat was then running between that place and Hon-

26

duras.   Then she came north and went to Camden, took board at Sixth and Chestnut streets, where her husband visited her once before he went to Scotland to build a ship.   Then she went to Jackson street, Camden, where he visited her once on a visit from New Orleans.   Then she thinks she went to Savannah again to her sister, and afterwards returned to Camden, where, she says, they bought property.   She explains the purchase of property thus:

"Mr. Valentine told me to see if I could see any cheap property to buy it as he wanted a home, and I saw a small house I thought I would like. He sent me the money to buy the house."

This house was 317 Atlantic avenue, Camden.   She moved into the house, she thinks, in 1882.   Her husband was still running between New Orleans and Honduras.   He visited her every year and invested his money in Camden property until, in 1893, there were seventeen properties in the joint names of husband and wife.

On November 30th, 1892, she filed a bill in this court against her husband for alimony.   This action upon her part seems to have been induced by the conduct of her husband in directing the agent who had charge of their joint properties not to pay any more of the rents to his wife.   In this proceeding Mr. Valentine seems to have been arrested.   It also appears, incidentally, that, in answer to the application for alimony, he denied that she was his legal wife.   This matter of difference seems to have been settled, and the testator returned and lived with her in Camden until about July 24th, 1893, on which date there were executed the articles of separation.

On account of the question which had been raised as to their marital *status,* their attorneys advised them to be, and they were, remarried.   Then they conveyed three of the properties to the wife and the remainder of the properties to Mrs. Wise, a sister of the husband.   Then the husband went to Philadelphia for a time, staying with his sister.   Having received a letter from his late employer in New Orleans, he again went south, entered into the old service and ran a boat from New Orleans to various South American ports.

Valentine v. Valentine.

Previous to the execution of the articles of separation, in 1893, his domicile was in the city of Camden. His wife had lived there for over ten years. He had invested all his earnings in Camden real estate. His wife lived in one of their houses, and there he lived with her whenever he came north, staying with her for several months previous to their final separation. In every deed made to them they were described as of Camden. In his will the testator described himself as of Camden. The same residential description is in the articles of separation, in the deeds for the division of their property and in the marriage certificate. Although he had a room in New Orleans, where he slept when on shore, he had no property there, and had explicitly refused to vote there, because he did not wish to become a citizen.

He had therefore, in my judgment, an acquired domicile in the city of Camden on July 30th, 1893.

The perplexing question is, did he change that domicile between that date and November 2d, 1897, to the city of New Orleans? Most of the material portion of the testimony attempts to reproduce declarations of the testator to show his domiciliary intention. The property in Camden which had been put in the name of his sister (Mrs. Wise) was evidently, as between him and her, regarded as still his, and he occasionally returned to Camden to see after this property.

David Dean says that he was there in 1895, and that, in a conversation between Valentine and witness, Valentine said, "Well, I am going to leave Camden. I expect to go south to stay there, making that my dominant home or whatever you call it. He said that he had no property here now; his sister had charge of the property and he had nothing to tie him here." Although the witness says that this conversation took place in 1895, he follows it by saying that Valentine was living at 315 Chestnut street and Mrs. Valentine was living with him. It is entirely clear that the Valentines never lived together after 1893. However, the matter of the conversation seems to indicate that it took place after the marital separation. This witness also swears to a conversation with the testator near 1887, six years before the separation, in which the testator then said

that he did not consider Camden his home; that he was longer at New Orleans than there.

William H. Stevenson swears that Valentine came to his house just before Christmas in 1895 to get the witness to do some work on a house. He says that Valentine told witness, who is a colored man, that there was a better chance for colored men in New Orleans than in Camden. He told him that his (Valentine's) home was broken up; that his sister would employ witness to do the work on certain portions of the property that she had under her charge; that he would not be down there any more, and it would be the last time he would see him; that Camden was not his real home; he was oftener away than here.

Patrick H. Kelly, a boilermaker, living in New Orleans, says that, in 1892, Valentine spoke of purchasing a tugboat on the river, if witness would use his influence to get him the towing of the garbage boats. Witness said to him:

"You don't vote with the gang, you are a Republican. Valentine replied that he was a resident here; that he had lived here off and on for twenty-five years; that he had made his home here off and on for twenty-five years; that he would be a Democrat here on account of the different kind of people and would like to get registered here, but he never got time."

He never bought the tugboat. This witness also says that, when Hancock and Garfield were running for the presidency, Valentine said that if he were a voter he would vote for Garfield. Valentine also told witness that he would never live north any more in winter; that he went north sometimes; that this was the year of the World's Fair, or the following year, when he told him that he could not live north.

Henry Bannon says that he lived with Valentine at Fannie Johnson's five or six years prior to his death. In a conversation, in 1895, Valentine stated that he intended to make New Orleans his permanent home, and that he intended to buy a lot in New Orleans and build a house upon it, if he could find one to suit him. Witness says that Valentine looked for a lot, but could not find one to suit him.

Fannie Johnson, a colored woman, in whose house Valentine had a room, says that, about three years ago, Valentine returned from the north, and said that he had troubles on his mind, and was going to settle in New Orleans; that he intended to buy a lot and build upon it, if witness would stay with him until he died. She consented, and Valentine looked for a lot, but did not find one to suit him.

In addition to this testimony of conversations, it also appeared that he was made a Mason in a lodge in New Orleans, and that, by a rule of the Grand Lodge of Louisiana, one of the conditions of membership was a local residence of one year; but it also appears that in the application of Valentine the blank left for the statement of applicant's residence is unfilled.

The foregoing, with the testimony regarding the length of time Valentine was in port between the trips of his steamship, constitutes the material part of complainant's testimony.

On the part of the defendants, Thomas Valentine, a brother of testator, says that, in the fall of 1893, after the separation, he saw his brother, who said that he had got a letter from the steamship-owner and expected to go down to New Orleans; that he liked Camden as a pleasant place to live, and as soon as he accumulated enough money to pay for what he had gone through (the expenses) he intended to remain at 317 Atlantic avenue, Camden. The witness also says that his brother told him, in 1893, that he had never voted in New Orleans, because he never intended to become a citizen there. He also says that, in 1897, he wrote from Norfolk to testator about coming to New Orleans, and that testator replied that he would not be in New Orleans long; that he was coming back to Camden, to stay there, and that, if witness should come down there, the testator would probably not be there.

Margaret Wise, a sister of the testator, to whom he had conveyed the remainder of his property, says that he both told and wrote to her that he was going to New Orleans to make a little money to take care of himself when he got old, and was coming back to live at 317 Atlantic avenue. She says that he sent her about five thousand dollars from New Orleans, which she was to put away for him; she spent some of it upon the property.

Henry B. Fullmer, an engineer, worked with testator for two years before his death. He says that testator told him that, when he made that last trip, that it was going to be his last, and that he was coming back to his home in Camden. He told him that all his property was in Camden, and that he would never vote in Louisiana. He said he would not vote when Prior was running for mayor about four years ago; that he never had voted and never would vote.

William Walden, a marine engineer, worked with testator for six or eight years prior to his death. He says that Valentine told him that his home was in Camden; that he had his property there. Walden accompanied Valentine on his last trip, and swears that Valentine said that he made that trip because he was afraid he would be quarantined—he meant if he went north. He advised the witness to stay by the ship; that he (Valentine) was going home, and witness would get promoted.

Matthew F. Boland, of New Orleans, says that he was a candidate for the legislature about eight years ago, and asked Valentine to vote for him, and Valentine said he could not, for he was a resident of Camden, and was not registered here. He spoke to witness of being tired of the kind of work he was doing; that he had money enough to keep him, and spoke of going back to Camden. It appears also that the property he had in New Orleans was a trifling amount of money in bank. The above is the material part of the testimony for the defendants.

The question propounded is, whether the testimony shows that the testator had, in addition to a residence in New Orleans at any time after his return there in 1894, an intention to remain there.

The question is not, whether he intended to abandon Camden, for he might have entertained such an intention, and yet not have acquired a domicile in the city of New Orleans. Such an intention would shift his domicile from Camden, but it would be to the domicile of origin. *Dic. Dom. 92.*

There is nothing to show that New Orleans was his domicile of origin.

If, however, he, for an instant, while having a residence, in fact, in the city of New Orleans, had also an *animus manendi,*

his domicile was there, until he changed it.   *Cadwallader* v.. *Howell, 3 Harr. 145.*

Nor need the intention to remain in New Orleans have been an intention to remain there until he died.   He may have had a floating intention to return to Camden, or some other place in the north, at some time, and yet his intention to remain in, New Orleans, for an indefinite period, might have been sufficient to fix his domicile at that place.   *10 Am. & Eng. Encycl. L. (2d ed.) 19.*

Nor would a subsequent intention to return to Camden, unless followed by an actual change of residence, affect his New Orleans domicile, for there must be the fact of residence as well as the intent to remain combined.

The general rule in respect to the acquisition of a new domicile is, that after a person has abandoned his domicile of origin, or his acquired domicile, his domicile will be considered to be in that place in which he has voluntarily fixed his habitation, not for a special or temporary purpose, but with a present intention of making it his home, unless, or until, something which is uncertain or unexpected should happen to induce him to adopt some other permanent home.   *Harral* v. *Harral, 12 Stew. Eq.. 279, 285; Firth* v. *Firth, 5 Dick. Ch. Rep. 137.*

In view of these well-settled rules the facts are to be viewed,. and they are not free from perplexing features.

On the one hand, it is apparent that his relations with the city of Camden, after his separation from his wife in 1893,. were entirely changed.   Before 1893 the fact that he had a family living in Camden would have been very important—I think a controlling factor—in fixing his domicile there.   After his separation the residence of his wife there would be of no significance whatever; indeed, his separation from the wife,. under the conditions mentioned, would lead to the inference, when he left the place, he intended to abandon her.

On the other hand, his residence in New Orleans after 1893 had no greater physical indications of permanency than before 1893.   He was a seafaring person, whose boat was his home,. except when in port, and he occupied a room, when on shore,. after, as he had before, his separation.   He had refused to vote

in New Orleans before, and he never did vote there after 1893. His talk about buying a tugboat was before 1893. The most important testimony is his declaration of intention, as testified to by Henry Bannon and Fannie Johnson, already detailed. But if this is an accurate statement of what he said in 1895, it is capable of two inferences—either that he then intended to make New Orleans his home, or that he intended to make it his home if he could find a lot to suit him to build upon. The testimony in respect to his declaration at the time he went south, after his marital difficulties, are conflicting. That he intended, in 1897, to leave New Orleans permanently and go north is, I think, proved. While this does not show a change of domicile, if it had once existed in New Orleans, it is important as a pointer in discovering his purpose of going there—whether it was to make a home there, or was, as his brother testifies, to get enough money to pay for what he had gone through, and then return to Camden.

As already remarked, the strong point for the complainant is the testator's return to New Orleans after his severance of his marital relations in Camden.

The strong point of the defendants' position is that the testator seems to have carefully avoided doing anything to indicate an intention to fix his permanent residence in New Orleans. It does not appear that he was taxed there; it does not appear that he studiously refused to vote there.

He left the place of residence in his application to the Masonic lodge unfilled. All his earnings he sent north to his sister. All his property was in the north, for there can be no doubt that the real estate in Camden, in the name of his sister, was understood to be his. In view of these facts, in connection with the fact that New Orleans was his residence only when in port, I cannot say it is proven that he ever intended to make New Orleans his home.

The bill should be dismissed.