JEANNE MARIE JOSEPHINE GIVERNAUD et al.

*v.*

ANITA VARIEL et al.

[Decided February 5th, 1916.]

The testator's domicile of origin was France. He became a naturalized citizen of the United States in 1873, his domicile of choice being West Hoboken, New Jersey. He left a wife and two children in France, who are the complainants in this cause. In 1871 he obtained a divorce in this state and remarried, one son being the offspring of this second

marriage.   In 1896, having amassed a fortune of $300,000 he decided to take apartments in New York, as he was constantly attending different places of amusement in that city, almost every night in the week, and he did not feel strong enough to come back to West Hoboken at night.  He made New York his headquarters, but was away, traveling in different parts of the world a very great part of his time.  He, on many occasions, emphasized the fact that he was still domiciled in New Jersey. He died in Los Angeles, California, in 1908, where he had bought a house in his son's name.—*Held*, that he never abandoned his domicile of choice, namely, West Hoboken.

*Messrs. Besson, Alexander & Stevens* and *Mr. Maurice Leon* (of the New York bar), for the complainants.

*Mr. John S. Mabon* and *Messrs. Collins & Corbin*, for the defendants.

LEWIS, V. C.

The only question which the court considers it necessary to decide in this case is whether Barthelemy Louis Givernaud had his domicile in the State of New Jersey at the time of his death, which occurred on January 2d, 1908, at Los Angeles, California.

For a clear understanding, I will set forth, at this time, the facts bearing on the case:  The testator, Barthelemy Louis Givernaud, was born in Lyon, France, on April 21st, 1835; on April 5th, 1860, he married, in France, Josephine Haour, both of them being French citizens. · Two children were born of that marriage, viz., the complainants, Joseph Givernaud and Noemi Josephine Marie Genin, *née* Givernaud, both born at Lyon, Joseph being born June 5th, 1861, and Noemi on August 30th, 1862.   By judgments rendered February 7th, 1866, and August 1st, 1866, in the civil tribunal of Lyon, Madame Josephine Givernaud obtained a separation from her husband, dissolving the community existing between them as to their property, and giving her leave to live separate and apart from him, and the custody of their children, on the ground of "abuse and injuries" and "abandonment."   He came to the United States of America in 1866, established himself in West Hoboken; obtained, in 1871, a divorce in this court upon service by publication on the

ground of "desertion," and thereafter contracted another marriage with Palmyre Elizabeth Lida Corriveau on the 30th day of May, 1872, and, as the fruit of this second marriage, a son, Charles L. Givernaud, was born to them, all three children being alive at the present time. In the course of time the testator became a very prosperous man, having factories at West Hoboken, Hackensack and Homestead, New Jersey, with an office in Green street, New York City. The bill was filed by the first wife of the testator and her two children born of their marriage, but she, the first wife, died during the taking of testimony, but, by stipulation, the testimony stands.

In the year 1873, the testator became a citizen of the United States, and from the time of his second marriage, until 1896, he lived with his wife at Spring and High streets, in West Hoboken. The second wife is also deceased.

The testator died on January 2d, 1908, at Los Angeles, California, having, on or about the 4th day of November, 1907, executed a last will and testament, in writing, which was admitted to probate by the surrogate of the county of Hudson on the 14th day of January, 1908.

The trust scheme contained in articles 9, 10 and 11 of the will is claimed, by the complainants, to be void, under the New York law, against perpetuities, found in laws of 1897, chapter 417, section 2.

It is admitted that if the testator was domiciled in New Jersey at the time of his death, that the said trust is a legal one, and the only doubt of its legality would arise in case the court found that he was not domiciled in New Jersey at the time of his death. My own opinion is, that if the testator were domiciled in New York at the time of his death, the New York courts would have to pass on the legality of this trust scheme, and not the courts of New Jersey. However, as I have concluded that the testator was domiciled in New Jersey when he died, I find it unnecessary to decide as to whether this court would have jurisdiction to decide on the legality of the trust if he had been domiciled in New York or elsewhere than in New Jersey at the time of his death.

The testimony shows that for many years the testator devoted himself to building up his business, and after he had become successful he devoted himself more and more to theatres, concerts and other amusements; he loved to travel and visit distant countries. He became acquainted with a dentist named Torillhon, and Dr. Torillhon became his companion, the testator being willing to pay the expenses of the companionship, and they used to go together to theatres and other entertainments in New York about five times a week, coming back to West Hoboken each night. That continued until the year 1896, when the testator decided to take apartments in New York. In the winter of 1895–1896, when caught in a snow storm while returning from New York to West Hoboken, the testator said to Dr. Torillhon: "I cannot stand these rough nights any more; I like my theatre, so I think that next winter I will take a room in a hotel, or somewhere in New York, so that I can enjoy my theatre;" and the next fall he asked Dr. Bertini and Dr. Torillhon to rent an apartment for him in New York, which they did. His wife continued to live in West Hoboken until 1898, when they sold the house, and she removed to New York, but not to live with her husband, the testator. They were uncongenial, and the testator never lived with Madame Givernaud after she left Hoboken in 1898, although he used to take meals with her occasionally. His brother lived in Homestead, New Jersey, and a room was set apart for him there, which was called "Mr. Louis' room." He had changes of clothing there and the use of a bedroom, but the defendants do not claim that he was domiciled anywhere else than in West Hoboken; their claim is, that he never changed his domicile from West Hoboken.

At all times when the question was broached the testator insisted strenuously that his domicile was New Jersey, and he went there to have his will drawn up in accordance with the laws of the State of New Jersey. The witness Joseph Braubach, however, testified that he overheard him saying to two gentlemen in New York, in his apartment, that he was glad he was through with West Hoboken. That might mean "I am glad I don't have to go back there nights," and, in view of all

his other statements, I must conclude that that is what he did mean; he certainly was not through with West Hoboken, as his factories remained there. He lived in many different apartments in New York, and he was away from New York much more than he was in New York. At the time of his death, shortly after he made the will in suit, he had no property in New Jersey, but kept his fortune, consisting of personal property, amounting to about three hundred thousand dollars, in a safe deposit vault in New York. In 1898, he made an extended trip to the west with Dr. Torillhon, and then returned to New York, staying there two weeks, and then took several short trips before going to Europe. In 1899, they went to California, to Hot Springs, to Glenwood Spa, and then came back to New York. The summer was spent at Atlantic City. Early in 1900, Mr. Givernaud again went to California. A few weeks after his return from California he went to Europe, accompanied by his son, Charles, and the wife of Charles, returning in the fall to New York. They then went to Atlantic City and came back to stay in New York, making short trips. These returns were all to his son's apartments, with the exception of the return from California, when he went to the Von Hoffman flats. In 1901, the testator, his son, Charles, and wife, and Dr. Torillhon, returned from Los Angeles and Honolulu to the New York apartment in Sixty-eighth street. He spent the summer of 1901 at Atlantic City and returned in the fall, making short trips from New York as a base in the fall of 1902. The winter of 1902–1903 was spent by Mr. Givernaud in California, returning to New York in the spring. And so it went on. He was constantly on the go. Sometimes he would spend a night in Homestead. Between 1896 and 1907 he moved to five different apartments in New York.

There is no doubt whatever that the testator firmly believed that he was domiciled in New Jersey. He certainly supposed there could be no possible question about that. In the fall of 1896 he asked Dr. Bertini and Dr. Torillhon to look up an apartment for him in New York, and they rented one under Dr. Bertini's name, though the testator paid the rent. Dr. Torillhon

testifies that at that time he asked him if he was going to leave his house to become a citizen of New York, and that he replied, "Never; my home is in West Hoboken, and I stay there." In 1898, when he was still living in New York, Mme. Givernaud sold the house in West Hoboken, and Dr. Torillhon testifies:

"I said to him, 'What are you going to do now; shall you make New York your residence?' and he said, 'No, I never intend to live in New York;' he said he had an aversion to becoming a resident of New York City, positively; he told me that positively twenty times."

Again, in the fall of 1898, Louis Givernaud made an affidavit in which he swore that he was a resident of West Hoboken, to avoid the payment of taxes in New York. There was no evidence offered to show that he paid taxes in New Jersey, or elsewhere, after 1898.

At the time of drawing the will in question, the testator, when asked by his attorney, Abel I. Smith, if he were still a resident of West Hoboken, stated that his domicile was there and he would be buried there. Mr. Smith testified:

"I asked him whether he had changed his residence, and said it was proper for me to know that, as the laws in different states varied in regard to bequests to charitable institutions. Mr. Givernaud said to me, 'No, I have not changed my residence; my domicile is here, and I have not changed it.' I am positive about the word 'domicile' because when he used the word 'domicile' he said it in French, and used the word 'domicile,' and said to me, 'Is "domicile" right?' and I said, 'Yes, it is the same in English as in French, 'domicile.' "

As a matter of fact, the meaning in French of the word "domicile" is not necessarily always the same as in English, but the word in that language may denote a domicile in name which is used for legal purposes only, while the actual domicile is maintained in an entirely different place. Again, before he left for California, in 1907, he had a conversation with Dr. Torillhon's sister, which Dr. Torillhon reports as follows:

"He had bought a house, I believe, in California; he had bought it in his son's name, like he always did, and she said to him, 'Now you are a resident of California;' and he said, 'Not a bit; I am a resident of West Hoboken.' "

Now, as to the law on the subject of domicile. Every man, woman and child has a domicile of origin. He may, however, choose another domicile for himself, but if he abandons his domicile of choice without adopting another domicile in the manner prescribed by law, then his domicile of origin becomes his domicile. So that, in this case, if the testator, when he left West Hoboken in 1896, had no intention of returning (*animo revertendi*), and did not take up such a residence in New York or elsewhere (*animo manendi*), then his domicile would revert to his place of birth, namely, Lyon, France.

"Domicile can only be changed *animo et facto,* and residence alone, although decisive as to the *factum,* is an equivocal act as to the *animus.*

"Domicile imports an abiding and a permanent home and not a mere temporary one.

"The acquisition of a new domicile involves the abandonment of the previous domicile, and to effect the change, the *animus* of abandonment must be shown." *Jopp* v. *Wood, 4 De G. J. & S. 616; 4 N. R. 422; 34 L. J. Ch. 212.*

"A change of domicile must be a residence *sine animo revertendi.* A temporary residence or business does not change the domicile. Also (1) every presumption is to be made in favor of the original domicile; (2) no change can occur without an actual residence in a new place; and (3) no new domicile can be obtained without a clear intention of abandoning the old.

"A mere change of residence, however long continued, does not effect a change of domicile in a testamentary sense, unless there is also an intention to change the domicile or throw off his native country, as for example, if an Englishman goes to France, he must not only reside in France but intend to become a Frenchman instead of an Englishman, before his domicile will be held changed." See 8 *Mews Eng. C. L. Dig. p. 234, &c., tit. "Domicile."*

"The onus of proving a change of domicile is on the party alleging it." *Munroe* v. *Douglas, 5 Mad. 379.*

"No length of residence without the intention of remaining will constitute domicile." See *Stout* v. *Leonard, 37 N. J. Law 492; Cadwalader* v. *Howell, 18 N. J. Law 138; Valentine* v. *Valentine, 61 N. J. Eq. 400; Crawford* v. *Wilson, 4 Barb. 504*

(at *p. 518*); *Matter of Thompson, 1 Wend. 45; Frost* v. *Brisbin, 19 Wend. 13; Haggart* v. *Morgan, 5 N. Y. 422* (at *p. 427*); *Matter of White, 116 App. Div. 183; Matter of Newcomb, 192 N. Y. 238; Flatauer* v. *Loser, 156 App. Div. 591*, first department, May 16th, 1913; also, the recent English case of *Huntly* v. *Gaskell (1906), App. Cas. 56; Watkinson* v. *Watkinson, 68 N. J. Eq. 632.*

A careful study of the evidence entirely satisfies me that the testator was domiciled in New Jersey at the time of his death. Actions do speak louder than words, and the courts place greater reliance on them, but I see nothing in Mr. Givernaud's actions to contradict his statements regarding his domicile. For convenience sake he made New York his headquarters, after the year 1896, when he was in this section of the country, but I cannot see that he ever made it his home in any sense of the word. True, he spent very little time in New Jersey after 1896, except to attend to his business here, but I am entirely satisfied that he never had any intention of abandoning his domicile in New Jersey, and never, for an instant, formed any intention of remaining indefinitely in any other state or country. Having reached this conclusion, the case is disposed of, and there is nothing further necessary to be said in the matter, and no reason exists for the court to pass upon the other questions which have been raised.