ESSEX COUNTY SURROGATE'S COURT.

IN THE MATTER OF THE ESTATE OF BLANCHE B. GILBERT, DECEASED.

Decided August 1, 1940.

For the proctors for the petitioner, *Pitney, Hardin & Skinner* (by *Corwin Howell*) and *Dechert, Smith & Clark* (by *Carroll Wetzel*, of the Pennsylvania bar).

For the respondents, *Edward R. McGlynn* and *Norman W. Harker* and *Maurice B. Saul* (of the Pennsylvania bar).

CLAPP, Deputy Surrogate. On December 7th, 1939, the Essex County Surrogate's Court by decree, granted letters of general administration respecting the estate of Blanche B. Gilbert, as of one who died intestate and a resident of this county. A day later her holographic will, unattested, was probated by the register of wills for the county of Philadelphia, Pennsylvania, on the representation that her domicile was there. On January 17th, 1940, Girard Trust Company, the executor named in the holograph, commenced this proceeding under *R. S.* 2:31-4 (*N. J. S. A.* 2:31-4) to set aside the surrogate's order granting the general administration.

The substantial question is as to the domicile of the decedent. However, there are matters of procedure that should not go unmentioned. That the Girard Trust Company is suing here as executor may be taken from allegations of its petition, disregarding, as we may, its failure to style itself

as executor in the introduction to the petition. *Evans* v. *Evans*, 23 *N. J. Eq.* 71. Whether to sue as executor was its only course, or whether it might have elected to sue individually, as in the usual action of an executor growing out of a transaction occurring after decedent's death, need therefore not be decided. *Morse* v. *King*, 73 *N. J. L.* 548; 63 *Atl. Rep.* 986, overruling *dictum* of *Stewart* v. *Richey*, 17 *N. J. L.* 164; cited in *Meyers* v. *Weger*, 62 *Id.* 432, 439; 42 *Atl. Rep.* 280. Suing as executor, the Girard Trust Company must predicate its authority on *R. S.* 3:13-7 (*N. J. S. A.* 3:13-7) (amended *L.* 1938, *ch.* 140) and the filing of an exemplified copy of its letters, which in this case was duly filed, prior to the commencement of this proceeding. The statute authorizes the prosecution of "any action * * * in any court of this state"—language adequate to cover this proceeding in the Surrogate's Court. That broad language is in no way to be confined by the words later appearing in the statute referring to "an action at law or a suit in equity"— words that do not properly comprehend a proceeding in a probate court. *Harris* v. *Vanderveer's Executor*, 21 *N. J. Eq.* 424, 434; *In re Merrill*, 88 *Id.* 261, 281; 102 *Atl. Rep.* 400.

As a matter of procedure also, it may be remarked that the petition herein was filed after the expiration of the time for appeal from the decree granting administration. There is a stream of authority in this state rising in *Watkinson* v. *Watkinson*, 68 *N. J. Eq.* 632, 642; 60 *Atl. Rep.* 931, to the effect that a decree in equity may be set aside after the time for appeal therefrom has expired, only in the case of newly discovered evidence or of some special equity. The surrogate's practice is essentially equitable. *In re Kellner*, 121 *N. J. Eq.* 243; 189 *Atl. Rep.* 91. Surely a special equity arises in a case where the decree is beyond the jurisdiction of the court, as the decree granting administration is herein determined to be. *Cf. McLaughlin* v. *Cross*, 68 *N. J. L.* 599; 53 *Atl. Rep.* 703; *Gloucester Trust Co.* v. *Goodfellow*, 121 *N. J. L.* 546; 3 *Atl. Rep.* (2d) 561. No view need therefore be expressed as to whether an erroneous representation made to the court, and still adhered to, as here, within the bounds

of reason and good faith gives rise to a "special" equity. See *In re Fischer,* 118 *N. J. Eq.* 599, 609; 180 *Atl. Rep.* 633, where possibly the time for appeal, then extending one year, had expired.

It may be that by way of exception to the principle of *Watkinson* v. *Watkinson, supra,* a decree *in rem,* obtained without litigation may be vacated at any time on a ground not a special equity. *In re Bradford's Estate,* 43 *N. J. L. J.* 14; *In re Kellner,* 11 *N. J. Mis. R.* 201; *In re Koehler,* 102 *N. J. Eq.* 133; 140 *Atl. Rep.* 15. The three cases last cited, however, depend much on New York cases which do not recognize the principle of *Watkinson* v. *Watkinson, supra,* and on the contrary hold that except as provided by statute a decree may be opened at any time. *In re Henderson,* 157 *N. Y.* 423.

In point of substance the first question is whether the petitioner has the right to attack the proceeding in this court. The challenge here is to the validity of petitioner's letters, and is based on the contention that Mrs. Gilbert was not domiciled in Pennsylvania at her death. The second question is whether Mrs. Gilbert died domiciled in New Jersey. The determination herein made that Mrs. Gilbert was domiciled in Pennsylvania at her death disposes of both issues. However, even if she were not then domiciled in Pennsylvania, the court, having concluded from the testimony adduced here that she never acquired a domicile in New Jersey, may of its own motion vacate its decree, thus found to be a nullity, even on collateral attack. It is thereby acting in the same manner as a court of general jurisdiction. *R. S.* 2:31-4; *Morris* v. *Glaser,* 106 *N. J. Eq.* 585; 151 *Atl. Rep.* 766; *affirmed,* 110 *N. J. Eq.* 661; 160 *Atl. Rep.* 578; 21 *C. J.* 715.

The first issue above stated is not expressed but can be drawn from paragraph third of the petition and answer. Furthermore, only on an issue so framed can there be explained the extensive proof and argument as to whether decedent was domiciled in Pennsylvania at her death.

On these two issues the burden of proof falls on the petitioner. 34 *C. J.* 352; *Cf. Ege* ads. *Dockerty,* 40 *N. J. L.* 99. There are two presumptions mentioned in the briefs. One,

perhaps, is that where a man is commorant, there his legal residence is. *Cadwalader* v. *Howell*, 18 *Id.* 138. Another is that a domicile once established continues in fact. *In re Dorrance*, 115 *N. J. Eq.* 268; 170 *Atl. Rep.* 601; 13 *N. J. Mis. R.* 168; 116 *N. J. L.* 362. The decision does not turn on these presumptions, however. When the presumptions work against petitioner and independent of them when they work in its favor, petitioner has submitted sufficient evidence to prevail.

On the matter of domicile, the facts should be detailed. Mrs. Gilbert was born domiciled in Evansville, Indiana. With her husband she acquired a domicile in New York State, which she retained at least until his death in 1922. From then on and until March, 1931, she spent much time in several places, including Philadelphia, Pennsylvania, and Caldwell, New Jersey. It was at Caldwell that there lived a step-daughter, Mrs. Strachan, of whom she was most fond. Mrs. Gilbert apparently visited Mrs. Strachan at the latter's home on Ravine avenue, Caldwell, for a month or so after Mr. Gilbert's death and, when departing, left for her future use there a comb, a brush, a toothbrush and a kimona. These things may have remained there for years. In this house and Mrs. Strachan's later home at 28 Hillcrest Road, Caldwell, there was a room which apparently, while the house was not rented to strangers (that is, from 1922 until October, 1936, and from May, 1937, until January, 1938), was known as "Mom's room." Mrs. Gilbert was called "Mom." At times (exactly how frequently it does not appear) Mrs. Gilbert would stay perhaps a week or ten days in this room. She always had a key to Mrs. Strachan's house. Despite the privilege she had to use this room, she spent several summers at an inn in Caldwell before 1927. It may be added, in relating Mrs. Gilbert's associations with New Jersey, that a favorite niece of hers lived near Caldwell from 1922 to 1937; that from 1925, or shortly thereafter and during the rest of her life, she had many, if not all, of her dividend checks sent in care of the Citizens National Bank of Caldwell; and, further, that several times she went house hunting in Caldwell from 1933 to 1937.

Up to 1935 there is no proof, circumstantial or testimonial, that she regarded her home as in Caldwell. She spoke of it, indeed, as her summer home, but coupled with the word "summer" the word "home" *prima facie* lost its domiciliary force.

Her associations with Pennsylvania were strong, too. She had a sister at Lansdowne, Pennsylvania, and a niece in Drexel Hill, near Philadelphia, where the sister at times stayed or lived. Mrs. Gilbert spent two periods of time in the Hotel Pennsylvania (later the Hotel Philadelphian), an apartment hotel in Philadelphia, during the years 1928 and 1929—on the first occasion registering from New York and on the second from Philadelphia. From March, 1931, until October 1st, 1937, except for periods each of about one month in the summers of 1931, 1933 and 1936, and except for some other shorter periods, Mrs. Gilbert stayed at the apartment hotel referred to. This is corroborated from numerous sources not necessary to relate; for example, she paid rent continuously for the period stated, except the three months named. This rent ranged from $185 a month to $110 a month—an amount which, during five years of the period, came to one-third or one-quarter of her gross income as shown on her income tax returns. She had but one suite in the apartment hotel during the entire period of 1931-1937, consisting of a large living room, a kitchen, measuring nine by twenty, and a dinette that may or may not have been part of the kitchen.

In about March, 1935, Mrs. Gilbert became exercised over the Pennsylvania personal property tax, which applied to those domiciled in Pennsylvania and as to which there was then some publicity. She decided thereupon that her domicile was at her step-daughter's in Caldwell and had the address put on her federal income tax return for 1934, made in the early part of March, 1935. She had used the Hotel Pennsylvania, Philadelphia, as her address on her income tax returns for the year 1930-1933 and for 1928. Prior to May 26th, 1936, the Federal Internal Revenue Regulations and law were silent as to the significance of the address required on an income tax return. By an addition to the

regulations (T. D. 4643, C. B. XV-1, 124, amending income tax regulations, article 51-2), effective from that date and still in effect, the address was required to be that of the taxpayer's "home or residential address."

The directory published by Price & Lee Company for Caldwell for 1935 and compiled from a canvass made in March or April, 1935, listed Mrs. Gilbert's name at her step-daughter's address, doubtless a result of her wish to change her legal residence to Caldwell. Such a directory has been held admissible in evidence. 6 *Wigmore on Evidence* (3d ed.), § 1706. Her name had not appeared in the Caldwell directories previously, nor did it thereafter, though be it added that in 1937, when the next directory came out, the Caldwell house was rented, Mrs. Strachan being in the hospital.

It is fully open to inference from the evidence that Mrs. Gilbert stayed at Mrs. Strachan's house for a short time on several occasions after she had decided that her domicile was there. On one occasion in 1935 or 1936 there is definite evidence that Mrs. Gilbert went to the address at Caldwell, saying to an employe of the Hotel Pennsylvania, in Philadelphia, before she left, that she was going "home" for a week or two. It should be noted, however, in considering the length of time she stayed at Caldwell, that a somewhat complete record of the statements of her several bank accounts (including that at the Caldwell Bank referred to) from the end of 1930 through April, 1937, discloses that not one of these statements, so far as discovered, went to Caldwell. Nearly all of them went to the Hotel Pennsylvania. In March, 1936, she again spoke of her home at the Caldwell address, at a time when she was giving directions as to her federal income tax return for 1935. In that return she declared the Caldwell address to be hers. On other occasions she spoke to two of her relatives, saying that her home was in Caldwell. It may be surmised that usually her declarations of residence in Caldwell were made when the Pennsylvania personal property tax came to her mind. On July 31st, 1936, she moved all her securities, which till then had been kept in New York, to her safe deposit box in the Caldwell Bank mentioned. From October, 1936, while Mrs. Strachan

was at the hospital, until May, 1937, and again commencing January, 1938, shortly before Mrs. Strachan's death in February, 1938, the Caldwell house was rented, but it is doubted that Mrs. Gilbert's consent as to the rental was ever asked, or that any consideration was given toward getting her consent. She had no property interest in the house. Apparently, while Mrs. Strachan was ill, a neighbor of hers put up Mrs. Gilbert in Caldwell on occasional week-ends, even though Mrs. Strachan's house was not then rented.

In March, 1937, the house being then rented, Mrs. Gilbert gave her address in her 1936 income tax return as "c/o The Citizens Nat. Bk. & Trust Co., formerly 28 Hillcrest Road, Caldwell, N. J." At one time, in the summer of 1937, Mrs. Gilbert proposed to Mr. Strachan that she come up from Philadelphia and live with him while Mrs. Strachan was in the hospital and pay the same as she was then paying at the Hotel Pennsylvania. She started to consummate this arrangement with Mr. Strachan, but only stayed overnight. Respondents' brief concedes that the arrangement was not completed.

In March, 1936, she had inquired whether the fact that her auto was licensed in Pennsylvania would make any difference as to her residence. She stored the car in Caldwell in the summer of 1937, leaving it there for the rest of her life, as she said "to help establish her residence there." She felt that help was needed. This gives a glimpse of the artificiality of her state of mind toward the alleged Caldwell domicile.

On October 1st, 1937, she left the Hotel Pennsylvania, going to a hospital in Philadelphia, then to a hotel in Atlantic City for seven days, then to another hotel in Philadelphia for a little over a month, then to two hotels in California for a total period of ten months and then to still a different hotel in Philadelphia for two weeks. The remainder of her life until her death November 22d, 1939, was spent in Pennsylvania hospitals. In each of these five hotels last referred to she registered as from Philadelphia.

There are several declarations made by her after October 1st, 1937, which are offered to prove her unchanged attitude toward her alleged domicile in New Jersey. The income tax

returns for 1937 and 1938 gave her address care of the Caldwell Bank named. Furthermore, she told a niece of hers that up to the time of Mrs. Strachan's death, her home had been with Mrs. Strachan. And she told a night nurse at the hospital where she died, that she had lived in Caldwell. On the other hand, she told another nurse that after her husband had died, she had traveled and when she became homesick she came to Philadelphia as her home. According to the testimony, she never mentioned New Jersey to the latter nurse.

In July, 1939, Mr. Stewart, who for some years had prepared her income tax returns, and Mr. Wells, an attorney, called on her in a Philadelphia hospital at her request with reference to her will. The former testified that she said to them "the only home I have I know of would be with my step-daughter in Caldwell." Mr. Wells' recollection apparently varies with this, for according to him she stated that she had stayed a great deal of the time with her step-daughter in Caldwell and that her business connections were there. Furthermore, Mr. Wells told her that there was a grave question as to her residence. He, thereafter, drafted a will, describing her as of Philadelphia, but it was never seen by her and there was no proof that she had authorized the statement as to residence. The will was admitted in evidence, not in proof of her residence in Philadelphia, but only in so far as it might impeach Mr. Wells' testimony. It does not impeach it and, therefore, has no force. Further, it may be noted that Mr. Wells testified that Mrs. Gilbert, when questioned as to her residence shown on her income tax returns, said "At my request, he [Mr. Stewart] filed them from Caldwell." The words "at my request" may contain a veiled indication that she doubted the propriety of his doing so.

The petitioner produced as a witness a Mr. Bishop, a lawyer associated with petitioner's counsel, who drafted a will for her shortly before her death. The will was never executed. He states that she said that she was a resident of Philadelphia and that the Hotel Pennsylvania had been or was her home. Mr. Bishop's testimony is largely corroborated by a representative of the bank who was present.

Respondents attack this testimony on the ground of its lack of candor. Even beyond the attack it cannot be believed that she threw over her four years' attempt at a New Jersey domicile without mention of it. However, in my view, the probabilities are that Mr. Bishop did believe her domicile to be in Pennsylvania and did persuade her to make an oral declaration of it. Such a declaration, however, adds little; she was to a large extent attempting to state a legal conclusion.

By way of generalization, it will be observed that here was a woman who, at least after 1922, had no civic interest and few domestic interests. All her furniture, except for a table belonging to her mother which she kept in her Philadelphia apartment, remained in storage from prior to 1922 until her death. She did no housekeeping in New Jersey, nor directed any to be done. On the other hand, she of course felt an authority as to her domestic affairs connected with her apartment at the hotel in Philadelphia and, indeed, did do some cooking there. She collected things, including linen, but these she put in a trunk found at her death in Philadelphia and probably never in New Jersey. Furthermore, it will be observed that she spent in Philadelphia most of her time from 1931 on—without being compelled to stay there from economic or other necessity. It was the place she preferred to be.

Depue, J., said in *Harral* v. *Harral*, 39 *N. J. Eq.* 279, 285, that to effect a change in domicile—"* * * the residence at the place proven for the domicile must be actual; to the *factum* of residence there must be added the *animus manendi;* and that place is the domicile of a person in which he has voluntarily fixed his habitation, not for a mere temporary or special purpose, but with a present intention of making it his home. * * *" As said in *In re Paullin's Estate,* 92 *Id.* 419; 113 *Atl. Rep.* 240, "we are not concerned with his possible motive," even if the motive be to avoid taxes.

On the matter of domicile, we cannot measure our case with the rules set in *Givernaud* v. *Variel*, 86 *N. J. Eq.* 80; 97 *Atl. Rep.* 49; affirmed, 87 *N. J. Eq.* 654; 103 *Atl. Rep.* 1054, or in *Trust Company of New Jersey* v. *Spalding,* 125

*N. J. Eq.* 66; 4 *Atl. Rep.* (*2d*) 401, urged upon this court by respondents, nor by *Texas* v. *Florida,* 306 *U. S.* 398, urged by petitioner. Too many circumstances both of our case and of those cases remain unmeasured.

In considering the *factum* of residence at Caldwell, it will be observed that from 1935 on Mrs. Gilbert stayed there but for a week or ten days on one trip and for other short periods on several other trips. Presence "for a space of time, however brief," may suffice to constitute the requisite *factum,* if the requisite intent concurs. *Cadwalader* v. *Howell,* 18 *N. J. L.* 138, 145; *Restatement, Conflict of Laws,* § 15 (3).

We may pass any question as to the *factum* of residence, for Mrs. Gilbert had not the requisite intent as to the Caldwell house. "The intention required for the acquisition of a domicile is an intention to make a home in fact and not an intention to acquire a domicile." *In re Dorrance, supra.* It is true that she at times used the word "home" in reference to the Caldwell house and that the idea of home· will vary somewhat with each homeseeker; but her mental associations with the house do not total up to that minimum, without which, in view of the law, no home can be acquired. Her declarations in this regard are not conclusive as to her intention. *Trust Company of New Jersey* v. *Spalding, supra.* Her actions belie her words. *Firth* v. *Firth,* 50 *N. J. Eq.* 137; 24 *Atl. Rep.* 916; *Texas* v. *Florida, supra.*

Prior to 1935 her attitude toward the Caldwell house was that of a visitor who was welcome to go there whenever she wanted, even without an invitation. What thoughts did she have in 1935, or thereafter, to change her regard toward the Caldwell house from that of a place to visit to a home for herself? It is conceived that she altered her attitude toward the place in no way, except at times to change the label for it to "home," "residence" or "domicile." And it is concluded that she did not usually apply that label in her thoughts. A home is more than a name. She did not intend to transfer to Caldwell any more of the domestic affairs of her life, if the word "domestic" may be used in a broad sense. She did not intend to stay there for any longer period of time than she had before, nor did she intend to go there any

oftener. Further, it is worth mentioning, slight as the factor is by itself, that neither before or after 1935 did she apparently give a thought toward paying her way at the Caldwell house, except for the day in July, 1937, referred to, when her arrangement in that regard was not completed.

Wherein, then, did her former attitude toward herself as a visitor at the Caldwell house, taken with the new label of home she occasionally put on the place, fall short of an intent to acquire a home? No attempt is made here to analyze the concept of home or the intimate relationship appertaining thereto. However, it may be said that she lacked a certain possessiveness, in point of that relationship, that goes with the phrase "my home," as distinguished from the phrase "someone else's place where I am always welcome." Furthermore, she had not, to the degree required, an *animus manendi*—an intent to settle down. "The question, therefore, of his domicile * * * is simply a question whether he has fixed his domicile in his habitation." *King* v. *King*, 74 *N. J. Eq.* 824; 71 *Atl. Rep.* 687. There is a notion of fixity or stability connected with domicile. This intention to settle down, to fix one's home, involves not only a mental disregard of permanent changes in habitation, but also a design to spend an amount of time there, the *quantum* of which has not been determined by the authorities. It is doubted whether Mrs. Gilbert planned to spend in the Caldwell house even a few days in each year. Even when she intended to go to the Caldwell house for a few days, it is probable that her attitude was that she might or might not go there another time as circumstances unfolded. Her relationship with the Caldwell house was all too casual.

The question now recurs as to whether she was domiciled in Pennsylvania at her death. Did she intend to make her apartment at the Hotel Pennsylvania her domicile for any time during 1931-1937? It is clear that she kept no string attached to her New York domicile after 1931; that domicile was abandoned. The testimony of Mr. Bishop, of the representative of the bank who was with him, and of one of the nurses who attended Mrs. Gilbert, puts in the record declarations made by her shortly before her death that she regarded

Philadelphia as her home. Even if these declarations are disregarded, there remain the hotel registrations in 1931, 1937 and 1938, where she declared herself as from Philadelphia. However, her own conduct circumstantially speaks even more loudly for her intent to settle down in the hotel and make it her fixed habitation. She was no casual visitor here. It is concluded that during most of the time that she was at the apartment hotel and until the last of her stay there, there was absent from her mind "any present intention of not residing permanently or indefinitely" in the apartment there. *In re Dorrance, supra.* A hotel building can become a domicile. *Title Guarantee, &c., Co.* v. *Isherwood,* 2 *N. J. Mis. R.* 342. And the Philadelphia apartment became hers.

By reason of the fact that she left that apartment in October, 1937, petitioner has felt a necessity of proving that she retained a citywide domicile in Philadelphia, all of which lies in Philadelphia county. *King* v. *King, supra; Restatement, Conflict of Laws,* § 9, comment (*b*), § 16, particularly comment (*d*). There is no force to the assertion that she acquired a domicile in the hospital just before her death. The evidence of a floating intention on her part to make Philadelphia her home city is none too adequate. Such an intention is conceivable, but comparatively rare. However, that matter need not be decided for in any case her domicile remained in Philadelphia. If she acquired no new citywide domicile, then she never lost her domicile in the Hotel Pennsylvania; for having acquired no new home, the domicile in the hotel continued as a matter of law, notwithstanding her abandonment of it. The *obiter dictum* of *Valentine* v. *Valentine,* 61 *N. J. Eq.* 400; 48 *Atl. Rep.* 593, following the English law that on the abandonment of a domicile of choice the domicile of origin revives, has been repeated. *Givernaud* v. *Variel, supra; In re Paullin's Estate,* 109 *Atl. Rep.* 13; affirmed on other grounds, 92 *N. J. Eq.* 419; 113 *Atl. Rep.* 240. But this rule is most unnatural in America and has nothing in public policy here to recommend it. The weight of authority in this country is contrary, and in accord with the holding here. That the Court of Errors has noted this trend of the law may be taken from its reference in *Watkinson* v. *Watkinson,* 68 *N. J.*

*Eq.* 632 (at *p.* 638); 60 *Atl. Rep.* 931, to 10 *Am. & Eng. Encycl. L.* 15. *Restatement, Conflict of Laws,* § 23, comment (*b*); 1 *Beale Conflict of Laws,* § 23.3. Furthermore, *Cf. Hibbert* v. *Hibbert,* 72 *N. J. Eq.* 778; 65 *Atl. Rep.* 1028, perhaps to the effect that one must definitely abandon the city of one's domicile as well as the house of one's domicile for the domicile of origin to revive; and even then the "artificial," "unusual" English rule "might" not be followed.

The conclusion, therefore, is that the grant of letters of general domiciliary administration by the Essex County Surrogate's Court was void for the reason that the court lacked jurisdiction, the decedent having been domiciled in another state at her death. *Romanchik* v. *Howard Savings Institution,* 118 *N. J. L.* 606; 194 *Atl. Rep.* 185; *In re Paullin, supra.*