This is an appeal from an order of the Monmouth County Surrogate's Court dismissing an order to show cause why a previous order of the surrogate admitting to probate the will of Eleanor Simpson should not be set aside.
The first question to be disposed of is whether or not this appeal is properly before the Prerogative Court. The decedent's will was probated before the surrogate of Monmouth County on February 16th, 1942, and a decree of the surrogate admitting the will to probate entered on that day. No appeal from that decree was taken to the Orphans Court within the time limited by the statute, R.S. 3:2-52, but on June 17th, 1942, a petition seeking the revocation of the decree was filed with the surrogate on the ground that the decedent was a non-resident of the State of New Jersey, and that, therefore, the surrogate was without jurisdiction to probate said will. A hearing was thereafter had on that petition, and on May 10th, 1943, the surrogate made an order dismissing the petition, holding that the decedent was a resident of and domiciled in this state.
On May 27th, 1943, a petition of appeal to the Orphans Court from the surrogate's decree of probate and his order dismissing the petition to set aside probate was delivered to the surrogate but he refused to file it on the ground that the appeal was not within time.
On June 18th, 1943, a petition of appeal to the Prerogative Court from the surrogate's decree of probate, and his order *Page 599 
dismissing the petition to set aside probate, were filed in this court.
On June 21st, 1943, a notice of appeal to the Prerogative Court from the surrogate's decree of February 16th, 1942, admitting the will to probate, and from his order of May 10th, 1943, dismissing the petition to set aside probate, was filed with the surrogate.
In re Frank's Will, 93 N.J. Eq. 405; 114 Atl. Rep. 857, a will was probated before the surrogate of Camden County and later a petition under chapter 133, P.L. 1917 p. 293; R.S. 2:31-4, was filed with the surrogate, seeking a revocation of his decree of probate on the ground that the decedent was a non-resident of New Jersey, and, after hearing, the surrogate revoked his previous decree. An appeal from the order of revocation was taken to the Orphans Court which held that an appeal in such case did not lie to the Orphans Court, and on appeal this was affirmed by the Prerogative Court. Vice-Ordinary Leaming held that sections 201, 202 and 203 of the Orphans Court Act (now R.S. 2:31-90,R.S. 3:2-52, R.S. 2:31-92, respectively) providing for appeals from the surrogate to the Orphans Court related only to affirmative decrees, such as decrees admitting a will to probate, and not to a decree denying probate, either in the first instance or subsequently by revocation of a decree of probate by proceedings pursuant to the 1917 act. He held that an appeal to the Orphans Court from the surrogate's order revoking the decree of probate did not lie. He did not decide that an appeal from an order of the surrogate dismissing a petition for revocation of a previous affirmative decree of the surrogate did not lie direct to the Prerogative Court.
In re Crociani, 11 N.J. Mis. R. 828; 166 Atl. Rep. 626, where a petition to revoke an order of the surrogate of Essex County granting letters of administration was filed with the surrogate, it was held that the jurisdiction of the surrogate under the 1917 act and of the Orphans Court under the sections of the Orphans Court Act above cited was concurrent, and that such a petition, although filed within the period in which an appeal might be taken to the Orphans Court, was properly filed. *Page 600 
 In re De Pascale's Estate, 134 N.J. Eq. 34; 34 Atl. Rep.
2d 4, Vice-Ordinary Lewis held that an appeal lies directly to the Prerogative Court from an order of the surrogate refusing to revoke his previous appointment of an administrator. It would seem clear that under the provisions of R.S. 2:31-90, an appeal to the Orphans Court lay in that case, notwithstanding which the court held that an appeal directly to the Prerogative Court was proper. That decision, it seems to me, is sufficient authority for holding that the appeal here is properly in this court.
The issue before the surrogate on the petition for revocation of his decree of probate was whether the decedent was domiciled in this state at the time of her death, and whether, therefore, the surrogate had jurisdiction to admit her will to probate. This appeal challenges his decision touching those questions.
Counsel for the parties have entered into a written stipulation filed in this cause by which they request this court to dispose of these questions on their merits, waiving all procedural technicalities in the event that this court decides that the present appeal is properly before it.
It is contended by the appellant that testatrix was domiciled at the Hotel Commander, 240 West Seventy-third Street, New York City, New York, because, he claims, that was the domicile of her husband, Arthur F. Simpson, and that, consequently, the surrogate had no jurisdiction to admit Mrs. Simpson's will to probate.
Our Court of Errors and Appeals in In re Chadwick's Will,80 N.J. Eq. 471; 85 Atl. Rep. 266, held that, "Neither the Prerogative Court, nor any of the surrogates, of this state have general jurisdiction to admit to probate the last will and testament of a non-resident having a domicile at the date of his death in another state, although decedent leave property in this state, except as ancillary to a probate by the courts of the locality of such domicile."
The question of domicile is frequently a troublesome one and the issue here presented is not of easy disposition.
It is the law of this state that the domicile of the wife follows that of her husband. In re Geiser's Will, 82 N.J. Eq. *Page 601 311; 87 Atl. Rep. 628; In re Paullin's Will (Court of Errorsand Appeals), 92 N.J. Eq. 419; 113 Atl. Rep. 240; Tracy v.Tracy, 62 N.J. Eq. 807; 48 Atl. Rep. 533; McCormack v.McCormack, 3 N.J. Mis. R. 624; 129 Atl. Rep. 212; Rinaldi v.Rinaldi, 94 N.J. Eq. 14; 118 Atl. Rep. 685; Floyd v. Floyd,95 N.J. Eq. 661; 124 Atl. Rep. 525; Brown v. Brown, 112 N.J. Eq. 600; 165 Atl. Rep. 643; Heimler v. Heimler, 129 N.J. Eq. 497;19 Atl. Rep. 2d 790; Baldwin v. Flagg, 43 N.J. Law 495.
This rule "results from the general principle that a person who is under the power and authority of another possesses no right to choose a domicile." Story, Confl. of Laws, ¶ 46; Shute v.Sargent, 67 N.H. 305; 36 Atl. Rep. 282. "By marriage, husband and wife become one person in law; that is, the very being or legal existence of the wife is suspended during the marriage, or, at least, is incorporated and consolidated into that of the husband, under whose wing, protection, and cover she performs everything." 1 Bl. Comm. 442 (quoted in Shute v. Sargent,supra.) "It is a legal sequence of the nuptial contract, and the unity of domicile exists during coverture, unless the wife acquires one elsewhere by the husband's consent. This consent may be either actual or constructive, and may be manifested by acquiescence, by abandonment," — or otherwise. In re Geiser'sWill, supra. See, also, In re Paullin's Will, supra; Brown v.Brown, supra; Rinaldi v. Rinaldi, supra; Floyd v. Floyd,supra; Heimler v. Heimler, supra. But when the reason for the doctrine of unity of domicile ceases to exist, the rule itself should fall. Shute v. Sargent, supra; Williamson v. Osenton,232 U.S. 619; 34 S.Ct. 442, 443; 58 L.Ed. 758. In this latter case Mr. Justice Holmes characterized this reason as "the now vanishing fiction of identity of person."
That husband and wife may have separate domiciles appears conclusively from the Geiser, Paullin, Floyd, Brown, Rinaldi
and Heimler Cases above cited. In the Paullin Case the court said, "That she may in a proper case acquire a domicile of her own apart from her husband is recognized not only in actions against him for divorce but in actions against other parties and in matters of inheritance," citing Shute v. *Page 602 Sargent and Williamson v. Osenton, supra. The instant case involves a matter of inheritance.
In Baldwin v. Flagg, supra, it was held that where husband and wife are living together, members of one family, the residence of the husband is considered in law the residence of the wife. But not always, as appears from Snyder v. Callahan,3 N.J. Mis. R. 269; 129 Atl. Rep. 410, and Eckert v. Donahue,3 N.J. Mis. R. 276; 129 Atl. Rep. 413. In those cases it was held that the residence of Mrs. Donahue was in Philadelphia, Pennsylvania, while that of her husband was in Surf City, New Jersey, where he was a candidate for public office. Judge Donges (now Mr. Justice Donges) there said, "It is undoubtedly true that, by operation of law, the domicile of the husband is, for many purposes, that of the wife, and that his domicile fixes her domicile for purposes connected with the marriage relation and the duties of husband and wife. Where a husband maintains several places of abode, to which his wife follows him in the performance of her marital duties, she may choose for herself where she will establish her voting residence." This would appear to be a justifiable relaxation of the rule of Baldwin v. Flagg,supra. And so with domicile. A wife may undoubtedly establish a domicile separate and apart from her husband with his consent or acquiescence. Such instances appear usually in matrimonial causes, but In re Paullin's Will, supra, is authority for the statement that they may appear in "matters of inheritance" such as the instant case. Some authorities hold that so long as husband and wife are living together in harmony, the wife can not acquire a separate domicile even with the consent of her husband.19 C.J. 414, § 33; 28 C.J.S., Domicile, § 12. An example is Inre Daggett's Will, 255 N.Y. 243; 174 N.E. Rep. 641;75 A.L.R. 1251. But the cited paragraph of Corp. Jur. also contains the statement that "The domicile of the husband is that of the wife only when the husband provides a domicile where the wife may go and stay at her will."
In 28 C.J.S., Domicile 25 § 12 subsec. d(1), it is said: "There is a conflict in the authorities as to whether a wife, living with her husband on amicable terms, can acquire an *Page 603 
independent domicile with his consent; some authorities deny her this right, but others permit it." Among the authorities which "permit it," the following New Jersey cases are cited: Rinaldi
v. Rinaldi, supra; Floyd v. Floyd, supra; McCormack v.McCormack, supra, and Webb v. Webb, 13 N.J. Mis. R. 439;178 Atl. Rep. 282. Undoubtedly many of the earlier decisions of this and other states were influenced by the decision of the United States Supreme Court in Haddock v. Haddock, 201 U.S. 562, 630;26 S.Ct. 525; 50 L.Ed. 867; 5 Ann. Cas. 1, expressly overruled by Williams v. North Carolina, 317 U.S. 287; 63 S.Ct. 207;87 L.Ed. 279; 143 A.L.R. 1273. In the latter case it was held that the right of a wife to establish a separate domicile was not confined to cases in which the husband was the offending party. If the law does not now recognize a right in a wife to establish a separate domicile with her husband's consent, it must be because she is still subject to the common law disabilities, most of which have vanished with the advance in civilization and the consequent recognition of the fact that she is a distinct human being entitled to all the rights and privileges of the male citizen. Hollander v. Abrams, 99 N.J. Eq. 254;132 Atl. Rep. 224; Shute v. Sargent, supra.
Of course the presumption is, that the domicile of the husband is the domicile of the wife (In re Paullin's Will, supra) and the burden of showing separate domiciles is upon the party asserting it.
The testatrix' domicile of origin was in Monmouth County, New Jersey. What was the domicile of origin of Arthur F. Simpson, her husband, does not appear, but undoubtedly he was domiciled in New York City at the time of his marriage to testatrix. It is equally certain that at that time she was domiciled in Monmouth County, New Jersey. At the moment of marriage a unity of domicile occurred and the husband's domicile became that of his wife unless she retained her domicile of origin by his consent, actual or constructive. Barring such consent, she became domiciled in New York. But it is possible that he abandoned his domicile and adopted her domicile as his own, and thus the united domicile came into being in New Jersey. The burden of showing such abandonment *Page 604 
and adoption is upon the respondents. Let us examine the facts and circumstances shown by the evidence in this cause.
Testatrix was born at Plainfield, New Jersey. She, with her parents, removed to Monmouth County, New Jersey, at an early age (eight or nine) and resided at the home of her parents there until she was married to Howard Whitfield, with whom she lived in Red Bank, Monmouth County, New Jersey, for many years, and until divorced in 1926. Thereafter, she continued to reside at Red Bank and Shrewsbury, New Jersey, until her marriage to Arthur F. Simpson, on July 21st, 1931.
The marriage certificate states the residence of Arthur F. Simpson at 32 West Eighty-ninth Street, New York City, and that of Eleanor Whitfield (the testatrix) at Shrewsbury, New Jersey.
After the marriage and honeymoon they went to Shrewsbury, New Jersey, where they resided with Mr. and Mrs. Evan F. Jones, for a month or more, and then went to Asbury Park where they remained for some time. Mr. Jones was Mrs. Simpson's brother. There is no evidence of their having maintained a home after their marriage at any place outside of Monmouth County, unless a room in the Hotel Commander, 240 West Seventy-third Street, New York City, which they occupied from time to time, beginning in 1938, could be called a home. True, Mr. Simpson's brother, Fred Simpson, the appellant committee, testified that Mr. and Mrs. Simpson always lived at that hotel after their marriage and that they never lived anywhere else. To the same effect is the testimony of Oscar C. Boelger, an uncle of Mr. Simpson. But obviously that is not so. Mrs. Jones, with whom the parties resided at Shrewsbury and later at Red Bank, Mr. Lynch and Mrs. Lynch, testatrix' sister, are equally positive that Mr. and Mrs. Simpson never had a "home" outside of Monmouth County after their marriage. The fact is that they traveled much — more or less with the sun — they spent the winter months in Florida, their summers in New England and New Jersey, and in traveling back and forth usually stopped in New York City for varying lengths of time. There is no evidence, however, *Page 605 
that Mr. Simpson ever returned to his address on Eighty-ninth Street in New York, recorded in the marriage certificate, after his marriage. Nor is there any evidence of animus revertendi.
In fact, there is no positive or reliable evidence of his ever having maintained a room or other place of abode in New York City subsequent to the marriage until May 25th, 1938, when, with Mrs. Simpson, he first registered at the Hotel Commander, giving their residence as "Shrewsbury, New Jersey." This is evidential of his abandonment of his domicile at the time of his marriage.
The appellant, on cross-examination, exhibited a paucity of knowledge concerning his brother's whereabouts after his marriage, and it is quite apparent that they saw very little of each other prior to Mrs. Simpson's death. The testimony of Mr. Boelger is no more helpful. He testified that he saw Arthur F. Simpson on an average of once or twice a week and that Mr. Simpson was in New York most of the time. In view of the hotel record to which I am about to refer, and the patent fact that Mr. Simpson was not in New York most of the time, I can not accept Mr. Boelger's testimony at its face value. Another circumstance connected with that testimony confirms me in this conclusion. Mr. Boelger testified that Mr. Simpson was engaged in business as an investment broker with offices at 115 Broadway, New York City. He gave his room number as 1121 and his telephone number as Barclay 3486. This was an obvious attempt to induce the court to believe that Mr. Simpson had continuously maintained that office and contained that business after his marriage and until Mrs. Simpson's death, when the fact was, as already shown by conclusive evidence, Mr. Simpson was unemployed, had no business and no income after his marriage. And further, it later developed that the card (evidently a business card) from which he was testifying, was ten years old and he said he had carried it in his pocket for over ten years. Such evidence is unconvincing.
The only authentic record of the times when Mr. and Mrs. Simpson stopped at the Hotel Commander is that contained in the hotel register or "guest index book" which was offered in evidence. That record showed that they had stopped at that hotel on the following dates and for the periods indicated: *Page 606 
 Arrived Departed Length of Stay
 May 25, 1938 August 27, 1938 3 months, 2 days
 October 14, 1938 October 16, 1938 2 days
 November 16, 1938 November 17, 1938 1 day
 November 23, 1938 November 26, 1938 3 days
 December 14, 1938 December 16, 1938 2 days
 December 29, 1938 December 30, 1938 1 day
 February 6, 1939 February 9, 1939 3 days
 May 8, 1939 May 9, 1939 1 day
 October 24, 1939 October 27, 1939 3 days
 November 1, 1939 No date of departure
 December 7, 1939 December 8, 1939 1 day
 December 12, 1939 December 15, 1939 3 days
 December 19, 1939 December 20, 1939 1 day
 December 30, 1939 December 31, 1939 1 day
 September 14, 1940 February 18, 1941 5 months, 4 days
*September 12, 1941 February 6, 1942 4 months, 24 days
* (Note: Mrs. Simpson died January 21, 1942; Mr. Simpson
checked out February 6, 1942)

The petition for probate of Mrs. Simpson's will was dated February 4th, 1942, two days before Mr. Simpson checked out. That petition gave Mr. Simpson's address as 240 West Seventy-third Street, New York City, and recited that testatrix died at that address, "a resident of the Borough of Shrewsbury, in the County of Monmouth and State of New Jersey, on Wednesday, the 21st day of January, 1942."
Two days after the date of the petition for probate Mr. Simpson was with Mrs. Jones in Red Bank, New Jersey, where he remained for about a month. The total time during which Mr. and Mrs. Simpson stayed at the Hotel Commander, from the date of their marriage in 1931 to the date of Mrs. Simpson's death in 1942, so far as the proofs show, was one year, one month and twenty-two days.
They were in Asbury Park, New Jersey, between 1933 and 1942, for varying periods, for a total of two years, five months and fourteen days, more than twice the total length of time spent in New York. On these occasions they resided at 415 Fourth Avenue, a boarding house maintained by Mrs. Lydia Hughes, who testified that Mr. and Mrs. Simpson stayed with her frequently, from 1933 to 1940, on the following dates as shown by her books: *Page 607 

 September 30, 1933 to October 31, 1933 1 month
 January 19, 1934 to January 21, 1934 2 days
 May 5, 1934 to May 6, 1934 1 day
 July 2, 1934 to October 6, 1934 3 mos., 4 days
 January 19, 1935 to April 23, 1935 3 mos., 4 days
 May 5, 1935 to May 6, 1935 1 day
 July 7, 1935 to July 9, 1935 2 days
 August 16, 1935 to November 7, 1935 2 mos., 22 days
 May 1, 1936 to May 2, 1936 1 day
 June 3, 1936 to July 1, 1936 28 days
 September 4, 1936 to September 6, 1936 2 days
 September 12, 1936 to *September 14, 1936 2 days
 October 5, 1936 to October 6, 1936 1 day
 October 8, 1936 to October 14, 1936 6 days
 November 1, 1936 to December 14, 1936 1 mo., 14 days
 January 8, 1937 to January 10, 1937 2 days
 April 6, 1937 to April 23, 1937 17 days
 May 5, 1937 to May 6, 1937 1 day
 May 28, 1937 to May 31, 1937 3 days
 June 1, 1937 to July 1, 1937 1 month
 September 21, 1937 to October 1, 1937 10 days
 October 4, 1937 to October 14, 1937 10 days
 January 30, 1938 to January 31, 1938 1 day
 May 4, 1938 to May 25, 1938 21 days
 September 12, 1938 to September 13, 1938 1 day
 September 30, 1938 to February 19, 1939 4 mos., 19 days
 May 1, 1939 to May 8, 1939 7 days
 August 1, 1939 to August 2, 1939 1 day
 October 21, 1939 to July 2, 1940 8 mos., 11 days
* (Note: The record gives this date as "December 14",
obviously in error in view of subsequent entries.)

But this was not all the time they spent in Asbury Park. They went there from Shrewsbury immediately after their marriage in 1931. But there is no record of how long they remained there. There were undoubtedly other occasions prior to September 30th, 1933, of which we have no written record, when they were in Asbury Park. Their longest sojourn at any one place of which we have any authentic record was for eight months and eleven days with Mrs. Hughes at Asbury Park. But their real headquarters seem to have been at Shrewsbury, Monmouth County, New Jersey, where they made their home with Mr. and Mrs. Jones until Mr. Jones' death in 1935. Thereafter, and until testatrix' death, the *Page 608 
same sort of home was maintained with Mrs. Jones in her apartment in Red Bank. It was to Mrs. Simpson's home with her brother in Shrewsbury that Mr. and Mrs. Simpson came immediately after their marriage. A room, called "Ella's room," was always and continuously set apart and maintained at the Jones' residence, both at Shrewsbury and at Red Bank, until testatrix died, and the room at Red Bank was occupied by Mr. Simpson for a short period after Mrs. Simpson's death. In those rooms were kept clothing and personal belongings of both Mr. and Mrs. Simpson — according to Mrs. Jones, "everything that they didn't carry with them" in their travels. In the Shrewsbury residence more of such belongings were kept than in the Red Bank apartment, because of lack of space in the latter, but at Shrewsbury there were kept pieces of household furniture, silverware and other personal property besides clothing. When Mrs. Jones removed to Red Bank much of this paraphernalia was put in storage either in Shrewsbury or Red Bank. We have no record of the times during which Mr. and Mrs. Simpson occupied their room at Mrs. Jones' home, but the times were frequent, and the total time must have been considerable. Mrs. Jones kept no guest register — she maintained neither hotel nor boarding house, but a home.
Shrewsbury was the only permanent mailing address maintained by the Simpsons during their married life. True, they sometimes received mail at the Hotel Commander, and quite likely at other places of temporary sojourn; but the Commander had instructions to forward their mail to Shrewsbury when they were not at that hotel, and they were not there most of the time. The fact that Shrewsbury was their permanent mailing address is to my mind a very clear indication of an animus revertendi. No matter where they wandered, they obviously intended to return to this address.
So far as the evidence discloses, the Simpsons never had a home which consisted of more than one room, no matter whether they were staying at the Commander in New York, a boarding house in Asbury Park, Mrs. Jones' residence at Shrewsbury or Red Bank, or elsewhere, notwithstanding the fact that Mrs. Simpson owned a large house at Red Bank *Page 609 
completely furnished. This house was never occupied by them — but there was always "Ella's room" in the Jones' home. While "not all persons have homes; every person must have a domicile."Restatement, Conflict of Laws, Topic, Domicile, § 12-B.
It is significant that whenever the Simpsons stopped at the Commander Hotel, Mr. Simpson always gave their residence as Shrewsbury, New Jersey. And it must be borne in mind that Mrs. Simpson's was the dominant personality; that Mr. Simpson had no visible means of support; no separate income, and no employment during all of his married life. She was the provider, she paid the bills, and it was but natural that he should adopt her home, her domicile, as his own. He filed no separate income tax report. The testatrix, in her income tax reports, filed at Camden, New Jersey, gave her residence as Shrewsbury, Monmouth County, New Jersey. Certified copies of her income tax reports from 1935 to 1941, both inclusive, were put in evidence before the surrogate. All except that for 1941 stated that Arthur F. Simpson had no separate income. The income tax report for 1941 was executed, signed and sworn to by Arthur F. Simpson, testatrix' husband, under date of February 27th, 1942, slightly over one month after her death. In it her residence is given as Shrewsbury, New Jersey.
Mrs. Simpson was registered and voted at Shrewsbury, New Jersey, although it is probable that she did not vote every year. There is no evidence of any record of Mr. Simpson's registration or voting except for the year 1940 when he registered and voted in New York City, giving his address as the Commander Hotel. But voting residence is not controlling as to domicile. Husband and wife may have separate voting residences. Snyder v. Callahan,supra; Eckert v. Donahue, supra. A residence for a special purpose does not necessarily constitute domicile. In reMichelsohn's Will (Prerogative Court), 37 Atl. Rep. 2d118; State of Texas v. Florida, 306 U.S. 398; 59 S.Ct. 563,830; 83 L.Ed. 817; 121 A.L.R. 1179.
Testatrix owned an automobile. A photostatic copy of her application for an automobile license was offered in evidence, *Page 610 
together with a certificate of the Commissioner of Motor Vehicles, showing that such a license was issued to testatrix for 1941. In the application she gave her address as 335-45 Broad Street, Red Bank, New Jersey. In March, 1942, Mr. Simpson applied for a license for this same automobile and in his application gave his residence as 16 Peters Place, Red Bank, New Jersey. On November 14, 1941, an automobile operator's license was issued to Arthur F. Simpson by the Bureau of Motor Vehicles of the State of New York, and in the application for such license Mr. Simpson gave his address as 240 West Seventy-third Street, New York City. A similar license was issued to him on October 5th, 1940, on a similar application. The statements of residence in the New York and New Jersey applications are contradictory, but it is the over-all picture which controls, and not particular incidents.
The death certificate issued by the Bureau of Vital Records,c., of New York City, recited the address of Eleanor Simpson as 345 Broad Street, Red Bank, New Jersey, and the name of the informant as "Arthur F. Simpson, 345 Broad Street, Red Bank, New Jersey."
Mrs. Simpson's maiden name was Jones, and she was buried in the Jones' family plot in Fairview Cemetery, Middletown, New Jersey. Her will was drawn by Peter Bentley, Esquire, a capable and careful lawyer who resides at Red Bank, New Jersey, and maintains law offices in Jersey City. He testified before the surrogate that he had drawn two wills for Mrs. Simpson and in both wills her residence is recited as at Red Bank, New Jersey. He said information as to her residence was obtained "from Mrs. Simpson by interrogating her." After her death, at the request of the executors named in her will, this same lawyer prepared the petition for probate and attended to other necessary details. The petition recited that testatrix was "a resident of the Borough of Shrewsbury, in the County of Monmouth and State of New Jersey." Asked where he got the information as to residence, Mr. Bentley said from Mr. Simpson, "I asked him in substance where Mrs. Simpson's residence was at the time of her death. He said, `It was and always had been claimed by her to be Shrewsbury,' or somewhere in Monmouth County. He said, `We *Page 611 
traveled around the country a great deal, we drove south in the winter, we spent some time in Shrewsbury and Asbury Park, New Jersey, we went to Maine' — I think it was, or one of the northeastern states — `in the summer and we spent considerable of our time in New York, usually at the Commander Hotel, when we went there we rented our apartment by the month, although the rent was payable in advance Mrs. Simpson, being rather tight, wouldn't pay the rent until the end of the month, so that if we decided to leave in the middle of the month she could — she would attempt to, and did succeed in only paying rent to the date that we moved.'" Of course the recital in the petition for probate of Mrs. Simpson's residence as Shrewsbury, New Jersey, does not create an estoppel. In re Chadwick's Will, 80 N.J. Eq. 168;82 Atl. Rep. 918. And jurisdiction can not be conferred by estoppel or consent.
Some confusion arises because the Simpsons were wanderers and seem never to have remained long in one place at a time, and because they gave their residence address on some occasions as at Red Bank and at other times at Shrewsbury; but I think the court should take judicial notice of the fact that Red Bank and Shrewsbury are adjoining municipalities and that the dividing line between them is practically invisible, one town merging into the other. However, "It may not be possible to fix the domicil more definitely than in a city or state, either because it has never been fixed definitely in a house, or because it has once been so fixed and the house has been given up or destroyed."Restatement, Conflict of Laws, ch. 2; Domicile, ¶ 9, Comment"b" — "A person does not always have a domicil in a lesser political unit than a state. It may be that, at a given time, such person is not domiciled in any municipal subdivision of a state although he is domiciled within the state in question," paragraph 11, comment "b" — "A home in a particular building is not necessary for the acquisition of a domicil," paragraph 16. But in the instant case there was always "Ella's room" in the Jones' home, either at Shrewsbury or Red Bank, which may well be considered the Simpson home, such as they had, and the particular location of their domicile as well; and it is quite *Page 612 
significant that Shrewsbury was their only permanent mailing address. Significant also is Mr. Simpson's remark, repeated many times according to the testimony of Mrs. Jones, "Well, Mabel, this is the only home I have," a remark repeated just before Christmas in 1941, within a month or so of testatrix' death. And immediately after Mrs. Simpson's death, he called Mrs. Jones by telephone and said, "I am coming home to you," and did so. Significant also is the fact that not until after Arthur F. Simpson was adjudged a mental incompetent and committed to the Harlem Valley State Hospital in the State of New York, by order of the Supreme Court of Westchester County, New York, in June, 1942, that any attack was made upon the probate proceedings before the surrogate of Monmouth County. By that order the petitioner appellant was appointed committee of the person and estate of Arthur F. Simpson. The petition to set aside the probate of Eleanor Simpson's will was sworn to by Fred Simpson, committee of Arthur F. Simpson, on June 16th, 1942, and filed with the surrogate on June 17th, 1942. Arthur F. Simpson had repeatedly declared in writing that his residence was at Shrewsbury or Red Bank, in New Jersey. Strange, indeed, that only after the lapse of four months from the probate of the will, and after the testatrix' husband was adjudged a mental incompetent, was it discovered, and then only by his brother, the appellant, that Mr. Simpson was wrong and that Mr. and Mrs. Simpson were not domiciled in New Jersey.
Much reliance is placed upon the Delaware case of New YorkTrust Co. v. Riley (Del., Sup.), 16 Atl. Rep. 2d772; by appellants, but the law of this state touching domicile is well settled. In addition to the New Jersey cases already mentioned, see Watkinson v. Watkinson, 68 N.J. Eq. 632;60 Atl. Rep. 931; 69 L.R.A. 397; 6 Ann. Cas. 326; In re Hartman'sEstate, 70 N.J. Eq. 664; 62 Atl. Rep. 560; Firth v. Firth,50 N.J. Eq. 137; 24 Atl. Rep. 916; Trust Company of New Jersey v.Spalding, 125 N.J. Eq. 66; 4 Atl. Rep. 2d 401; Givernaud
v. Variel, 86 N.J. Eq. 80; 97 Atl. Rep. 49; affirmed, Plahn v.Variel, 87 N.J. Eq. 654; 103 Atl. Rep. 1054; In re Dorrance'sEstate, 115 N.J. Eq. *Page 613 268; 170 Atl. Rep. 601; Dorrance v. Thayer-Martin,116 N.J. Law 362; 184 Atl. Rep. 743; Cadwalader v. Howell,18 N.J. Law 138; Stout v. Leonard, 37 N.J. Law 492, and Harral v.Harral, 39 N.J. Eq. 279; 51 Am. Rep. 17. And see Burkhardt v.Burkhardt, 8 W.W. Harr. (Del.), 492; 193 Atl. Rep. 924,925. Each case involving a question of domicile must be determined on the basis of its own peculiar circumstances, and in so far as the Delaware case relied upon by appellants may be considered as in conflict with our own decisions, it should be disregarded.
In his conclusions the surrogate held that Mr. Simpson was domiciled in New Jersey and also that he acquiesced in his wife's retention of her domicile of origin, which was in New Jersey. I think the evidence before the surrogate fully justified his finding that Mr. Simpson was domiciled in New Jersey and I am convinced that upon his marriage to Eleanor Whitfield he adopted her domicile as his own and retained that domicile until her death. Under the rule that the domicile of the husband is the domicile of the wife, therefore, Mrs. Simpson was domiciled in New Jersey at the time of her death. It is not, therefore, necessary for me to pass on the question as to whether the testatrix retained her domicile of origin and, therefore, had an independent domicile, separate and apart from that of her husband, with his acquiescence.
I will advise a decree in accordance with these conclusions.
 *Page 1